# EXHIBIT E

*Report of Maureen P. Baird*

*CV – Maureen P. Baird*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **UNITED STATES** | **: Case Number: 8:09-CR-25-T-27 AEP** |
| | **:** |
| **v.** | **: Senior Judge: Hon. James D. Whittemore** |
| | **:** |
| **JEREMY NEIL EUBANKS** | **:** |

### DECLARATION OF MAUREEN PATRICIA BAIRD

I, Maureen Patricia Baird, declare that the following statements are true:

### BACKGROUND OF DECLARANT

1. I am an independent prison consultant. From March 1989 through September 2016, I was employed by the Department of Justice, Federal Bureau of Prisons, and served in many capacities.  My last three positions held were Warden, Federal Correctional Institution, (FCI) Danbury, Connecticut (2009-2014), Senior Executive Service (SES) Warden, Metropolitan Correctional Center (MCC), New York (2014-2016), and SES Warden, United States Penitentiary, (USP), Marion, Illinois (2016-Retired).

2. In my capacity as Warden at these institutions, I was responsible for the overall operation and all components of each prison. I am fully knowledgeable of the operations and policies of the Bureau of Prisons, (BOP) and very specifically familiar with the operations of the Communication Management Unit at USP Marion.  My professional experience of working in federal corrections included many areas.  In two of the BOP Regional Offices I worked, one of my duties included the classification and designation of newly committed inmates, as well as reviewing and approving inmate transfers to other federal prisons.  Initial designations and subsequent transfers required a thorough review of the inmate's complete pre and post commitment record, to ensure accurate placement at an appropriate security level prison.  Another one of

my duties when I was assigned to the Regional Offices, was to review and respond to inmate grievances, regarding all topics pertaining to correctional programs, including appeals related to the discipline policy.  Throughout the course of my career, in many of my positions, I was required to assess an inmate's risk formally and informally. This risk assessment was especially critical when an inmate was being considered for a lesser security prison transfer or a community program.

3.     Since my retirement from the Bureau of Prisons, I have maintained contact with many former colleagues.  Since early 2017, I have worked as an independent prison consultant and have provided expert witness testimony. I have kept abreast of new policies and laws that directly impact the Bureau of Prisons.

4.     Most recently, I have been preparing reports for filing in various United States District Courts throughout the country. These reports are prepared for the purpose of Compassionate Release consideration or for inmates who are being considered for release under the Incarceration Reduction Amendment Act (IRRA). In preparation for these reports, I am required to review all the prison records of each inmate so I can provide a concise and thorough report for the Court.

5.     I have previously been qualified as an expert witness in federal courts in the areas of prison management, prison practices, and prison adjustment.

6.     A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.  A comprehensive list of my expert witness testimony I have provided during the previous four years is attached to this report as Exhibit B.

## SCOPE OF REPORT

7.    I was contacted by the University of Iowa College of Law Clinical Law Programs, who are representing Jeremy Neil Eubanks an inmate confined at the United States Penitentiary (USP) McCreary, Kentucky.  I understand Mr. Eubanks is applying for a Sentence Commutation from the President of the United States.

8.    I was asked to review BOP records so I may render my assessment of Mr. Eubanks' institutional adjustment over the last 13 years. I was also asked to provide my opinion regarding how Mr. Eubank's prior assignment as a Military Police Officer, with the United States Air Force, may have affected his institution adjustment and his incarceration in federal custody.  Finally, I was asked to opine on appropriate programs for Mr. Eubanks, which may be available within the federal prisons to address his substance abuse issues and assist in his rehabilitative efforts.

9.    In preparation for my declaration, I reviewed numerous documents relevant to Mr. Eubank's case.  The documents I reviewed included:

- Discipline Record
- Education Record
- Sentence Computation Data Sheet
- First Step Act Pattern Risk Assessment
- Military Records
- Classification Form
- Work History Records
- Social Summary
- Program Review Reports
- Psychology Services Reviews and Data Reports
- Medical Records (limited number)

3

10.     During my 27-year career with the BOP, I held many different positions.  During those

years, I had been assigned to three different regional offices, which had oversight of

all security level prisons, from minimum security prison camps to high security

penitentiaries.  I was also assigned at eight federal prisons, in various capacities,

during my employment with the Agency.  One of my duties while working in these

positions was to properly score and classify an inmate's security level and designate to

an appropriate federal prison for service of their sentence.  As a former case manager,

I evaluated inmates assigned to my caseload and made program recommendations

based on their individual needs.  I also chaired numerous Unit Discipline Committee

(UDC), hearings following the issuance of misconduct reports, to ascertain whether a

violation of the rules had occurred.  In the instances where there was a finding of guilt,

I was responsible for administering appropriate sanctions.

## SECURITY CLASSIFICATION

11.     The BOP classifies facilities into four categories which are Minimum (Camp), Low

Medium, and High security.  There are also administrative facilities such as

Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC)

and Federal Medical Centers (FMC), which house all security levels.  After

sentencing, defendants are assigned an initial Security Classification by the BOP to

determine the appropriate institution for housing during a term of incarceration.  Some

of the factors used in this classification are age, history of violence, previous escapes,

criminal history, history of violence and severity of the instant offense.  Each factor

has a corresponding point value.  Once the points are totaled, the sum is matched to a

point matrix associated with differing security levels. Following is a chart from the

BOP classification manual (CPD/CPB, Number P5100.08, *Inmate Security Designation and Custody Classification:*

| Security Level | Male | Female |
|---|---|---|
| MINIMUM | 0-11 Points | 0-15 Points |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24 + Points | 31 + Points |

12.   Mr. Eubanks is classified as High security, which explains his placement at USP McCreary.  USPs are noted for housing the BOP's most violent offenders and gang activity is prominent at all these high security prisons.  Fights, threats, intimidation, and extortion are a way of life inside of these prisons.  Few inmates can overcome the pressures and influences of gangs to live their life in some productive manner.

13.   Drugs and alcohol are ever present and used to entice inmates to be part of a gang or social group.

14.   High security prisons represent a difficult environment for inmates who are looking for help and self-improvement.

**INSTITUTION ADJUSTMENT**

15.   I spoke with Mr. Eubanks, along with his counsel, during a legal call.  I was impressed with how candid Mr. Eubanks was with me during the call when he addressed all the questions I posed.  During the call, I asked Mr. Eubanks to explain, from his perspective, the reason for the various misconduct reports he received over the years.  Mr. Eubanks did not make excuses for the infractions and was very forthcoming, taking full responsibility for his behavior and actions.  He explained his reasons for the

5

misconduct violations and, because of my experience working in corrections, I was able to grasp the information he shared to gain a greater understanding of what had occurred. In speaking with Mr. Eubanks, I had a chance to address how his behavior directly impacted his assignment to a high-security level penitentiary.  He fully understood the nexus between demonstrating positive institutional adjustment with obtaining a transfer to a less secure, medium level prison.  In fact, Mr. Eubanks indicated he has engaged in these conversations with his current case manager who advised him he will be submitted for a lesser security transfer once the COVID-19 pandemic has settled.   This is all conditional on his maintaining continued positive adjustment.  Mr. Eubanks advised of his desire to obtain a transfer to a medium security level institution and credits these last 12 months of clear conduct as his way of achieving that goal.

## DISCIPLINARY ISSUES

16.   There are four levels of severity the BOP utilizes to categorize misconduct reports. Those categories are: Greatest, High, Moderate and Low Moderate. Examples of Greatest severity prohibited acts are rioting, taking hostage(s), possession of narcotics, and possession of a weapon. High severity incident reports would include fighting, extortion/bribery, and threatening conduct. Moderate severity level misconduct may be for refusal to obey an order, insolence toward staff, lying, or being in an unauthorized area. The least severe misconduct violations are low moderate severity level and include acts like using abusive language, unauthorized physical contact with a visitor, possessing another inmate's property, or conducting a business.

17.   In reviewing Mr. Eubanks' disciplinary records, I noted a specific pattern to the misconduct violations.  The one recurring theme in the records is Mr. Eubank's drug and alcohol use.  Between August 2010 and April 2021, Mr. Eubanks incurred 7 incident reports directly related to his use of drugs and alcohol.  Mr. Eubanks claims all the drug infractions were for his use of Suboxone; however, I do not have the specific lab results for to confirm this information.  There is a staff memorandum dated March 23, 2021, and lab results for the 2021 incident, which states Mr. Eubanks tested positive for Buprenorphine, one of the main active ingredients found in Suboxone.  Suboxone, in society, is often used to treat individuals with opioid addictions and narcotic dependence, but among inmates it is used to obtain a quick high.  When asked why he had numerous incidents for these charges, Mr. Eubanks explained the drugs and alcohol provide a temporary relief to his anxiety associated with his Post Traumatic Stress Disorder (PTSD).  Mr. Eubanks offered no excuses and he advised, at the time of using the drugs and/or alcohol, he didn't think about the consequences of his actions, and was only considering the instant temporary escape the substances allowed him to experience.

18.   The remaining nine incident reports were assessed for various rule infractions.  Two of these infractions which occurred in 2015 and 2018, were for assault and fighting, respectively.   During my interview with Mr. Eubanks, I asked for his perspective on why these two incidents occurred.  Mr. Eubanks asserts the fight in 2018, was directly related to his former assignment as a Military Police Officer in the United States Air Force.  He stated another inmate approached him with the purpose of fighting due to his former status in the military.  Mr. Eubanks asserts he was only defending himself, although he understood self-defense was not excusable by the BOP and as a result, he would face

7

disciplinary action.  The assault charge in 2015, involved Mr. Eubanks and two other individuals who assaulted a fourth individual on the recreation yard.  According to Mr. Eubanks, they were following the orders of other inmates, to have the inmate "victim" removed from the yard.  Minor injuries were reported following the incident and all inmates involved were placed in the Special Housing Unit (SHU).

19.   It is not unusual for inmates in a penitentiary setting to enforce certain unwritten rules. One of the unwritten rules amongst inmates in a penitentiary environment requires all inmates to produce verification "paper" in the form of a Statement of Reasons or Court Docket, to prove they have not been convicted of a crime against minor children and to show they did not cooperate via testimony or information with law enforcement officials regarding the criminal activity of others.  If these inmates are unable to provide this proof within a certain period, they will no longer be safe in the general population of the prison. As explained by Mr. Eubanks, the inmate who was assaulted in 2015 had not been able to produce the documents needed for him to remain on the compound in general population.

20.   There were two additional Greatest severity, 100-level infractions.  In 2011, Mr. Eubanks was sanctioned for Code 104, Possessing a Dangerous Weapon, and in 2019, he was sanctioned for Code 108, Possessing a Hazardous Tool.  It is not my intent to minimize Mr. Eubank's disciplinary actions; however, for those inmates incarcerated at a penitentiary, it is not uncommon to incur numerous incident reports.  For the most part, inmates at every security level prison abhor former law enforcement officers and when they become aware there is one amongst them, the individual often becomes the target of abuses, as Mr. Eubanks has described as his prison experience.

21. The remaining incident reports were for a mixture of High severity, 200-level infractions and medium severity, 300-level infractions.  These charges were for various infractions including, Refusing to Obey an Order, Being Absent from Assignment, Phone Abuse, Being Unsanitary or Untidy, and Disruptive Conduct.  Sanctions for these misconduct violations ranged from loss of good time to loss of phone, commissary, and email privileges.

22. The majority of Mr. Eubank's time in federal prison, has been spent in different penitentiaries, with three relatively short stays at FCI Victorville, California, FCI Bennettsville, South Carolina, and FCI Edgefield, South Carolina, all Medium security level facilities.  The inmate population within a penitentiary environment is much different than medium and low security institutions.  Many of these high security inmates are serving life sentences and have little incentive to follow prison rules.  In my experience, I found it to be common for inmates at penitentiaries to possess weapons as a means to protect themselves against real or perceived harm.  The penitentiary environment is often a violent, unpredictable, and ever-changing setting, never knowing from one day to the next what will happen.

## EDUCATION AND PROGRAM PARTICIPATION

23. Mr. Eubanks has immersed himself in various programs since beginning service of his sentence.  During his time at FCI Victorville Mr. Eubanks completed the following courses and programs:

- Embracing Diversity
- Basketball Officiating Class
- Veteran's Assistance Program
- Beginner's Leather Craft

9

- Hispanic Biographies
- Last of the Mohegans
- Cultures of the World

During his time in the Special Management Unit (SMU) at USP Lewisburg, between 2012 and 2013, Mr. Eubanks completed several additional courses including:

- Ambiguous Situation/Wisdom
- Psychological Success
- Activity Packet Round C
- Problem Solving/Decision Making
- Classical History
- Nutrition (Rounds C and H)
- Memory (Rounds C, F, and H)
- Parenting (Rounds C and H)
- Lifelong Wellness (Rounds F and H)
- Money and You/World Works
- Double Your Productivity
- China/The Silk Road
- Lexington/Picketts Charge (History Course)

While housed at USP Coleman, Florida, USP Big Sandy, Kentucky, USP Canaan, Pennsylvania, and USP Lee, Virginia, Mr. Eubanks continued his participation in positive programming and recreational activities.  He completed the following classes and programs:

- Maintenance Program (2 classes)
- Intermediate Jump Rope
- Softball Sports Rules (2 classes)
- Stretching Class
- Health and Nutrition
- Tournament Management Class

- Finances
- Relapse Prevention
- Job Interview Skills
- Release Preparation Orientation
- Aids Awareness
- Turning Point
- Re-Entry Resume Writing
- Getting the Perfect Job
- GP Electoral College
- Fluids and Exercise
- Sun Smart Program
- Badminton
- Beginner's Drawing Class
- Guitar Program for Beginners
- U.S. History

During his brief time at the Bennettsville and Edgefield institutions, Mr. Eubanks completed some additional courses including:

- Aids Awareness
- Physical Science
- Vocabulary

24. The one main program, a comprehensive drug treatment programs, which Mr. Eubanks desperately needs, and which the BOP offers, is currently not available to him. Various research conducted by the BOP and other studies have shown the 500-hour Residential Drug Abuse Program is the BOP's most intensive and effective drug treatment program whose results indicate that participants are "significantly less likely to recidivate and less likely to relapse to drug use than non-participants. [1] This comprehensive, cognitive

---

[1] Federal Bureau of Prisons, "Substance Abuse Treatment,"
https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp

behavioral therapy program focuses on addressing and reducing recidivism, criminality, relapse, and misconduct.  Inmates spend a minimum of nine months in this residential program, followed by six months of transitional drug abuse treatment in a community setting, like a halfway house and/or home confinement.  Inmates must be eligible to participate in all components before they are allowed entry into the program. Unfortunately, with Mr. Eubanks' release date of January 16, 2037, being so far in the future, he will not be eligible to participate in RDAP for at least another 12 years.

25. One additional newer program which may benefit Mr. Eubanks, if allowed to participate, is the BOP's Medication-Assisted Treatment (MAT), Program. The Program incorporates cognitive behavioral therapy, combined with the use of medications.  In 2020, the U.S. Government Accountability Office (GAO) conducted a study to review the BOP's efforts to provide drug treatment to the inmate population. [2]

26. GAO reported the BOP was taking steps to expand the MAT Program; however, there were specific planning elements which were critical to the expansion efforts, that were non-existent at the time of their review.  Specifically, the BOP would need to recruit and retain additional personnel to support the expansion of the program; however, the Agency has not identified the number of additional staff needed or how they plan to achieve this goal.  Additionally, they have not established any dates or time frames for completing these necessary requirements.

27. GAO estimated that 20% of the BOP's inmate population of approximately 175,000 inmates, were diagnosed with substance use disorder; that is 35,000 federal inmates.

---

[2] U.S. Government Accountability Office, *"BUREAU OF PRISONS  Improved Planning Would Help BOP Evaluate and Manage Its Portfolio of Drug Education and Treatment Programs (GAO-20-423)",* June 2020.

The First Step Act of 2018 requires the BOP to provide drug treatment for heroin and opioid abuse, along with the expansion of the MAT Program.  According to the BOP's December 2020, Attorney General's First Step Act Annual Report, only 7,000 inmates, within 98 federal prisons and 147 halfway houses had been screened for the MAT Program.  Of those 7,000 inmates, only a small fraction, 409 inmates, were enrolled in the program.  It is likely the majority of those inmates were already released from prison and residing in halfway houses.  There is limited data available regarding the MAT Program and Mr. Eubanks has not received any notice of his eligibility for the program, has not been informed of any MAT Program commencing, nor has he been asked if he has an interest in participating in such a program. [3]

28. Following the GAO study, there were seven recommendations made to assist the BOP in expanding their MAT Program.  These recommendations offered to the BOP Director included the action steps required to expand and implement a successful MAT Program.

29. In my experience and based on what the BOP has recently demonstrated with their untimely implementation of the First Step Act, new initiatives, and programs, like MAT, take a long time to put into place.  The BOP, as consistently reported by news agencies and at Senate and other Congressional Hearings, is already experiencing a severe shortage of staff and despite the emphasis on recruitment and retention, they are still falling short.

30. There are other drug treatment programs available to Mr. Eubanks, the Drug Education Program, and the Non-Residential Drug Abuse Program.  These programs, unlike the

---

[3] United States Department of Justice, Office of the Attorney General, *"The Attorney General's First Step Act , Section 3634, Annual Report,"* December 2020.

RDAP, are not intensive and have not proven to be effective at positive change. They are more educational-type drug awareness programs, which don't offer nearly the impact a program, like RDAP, that can deliver the help an individual like Mr. Eubanks needs.

### SECURITY AND CUSTODY CLASSIFICATION

31. BOP Program Statement, 5100.08, Security Designation and Custody Classification, is the policy utilized by designations staff who are assessing an inmates' case, conducting an initial security classification, and deciding on appropriate prison placement.

32. There are five security levels utilized by the BOP to classify federal prisons. Those security levels include Minimum, Low, Medium, High, and Administrative. Sentenced inmates are usually designated to federal prisons which are commensurate with their security levels. Pre-trial detention facilities and federal medical prisons are classified as Administrative and are comprised of inmates of all security levels.

33. Following sentencing, inmates are initially classified and designated for service of their sentence by staff assigned at the Designations and Sentence Computation Center (DSCC), in Grand Prairie, TX. The documents utilized by the DSCC during the initial classification are the Presentence Investigation Report, Judgment in a Criminal Case, disciplinary record from prior or current commitment, and any additional relevant documents from various law enforcement agencies.

34. Several factors are considered when an inmate is initially classified. Some of the factors that impact classification include age, pending charges/detainers, seriousness of current offense, history of violence and escape, sentence length, and voluntary surrender status.

Each of these areas have a corresponding point value, which is then totaled to determine an inmate's overall security level.

35. DSCC staff also use Management Variables (MGTV) and Public Safety Factors (PSF) to account for additional security considerations, not captured in the other categories. The MGTV's and PSF's are used to justify an inmate's designation to an institution which is not commensurate with his numeric security point total. There are specific factors, which if applicable to an inmate, would indicate his/her need for increased security to protect society. In most cases, the PSF's impact the inmate's security level, causing an increase, which overrides the security point score. The PSF's for male offenders include Disruptive Group, Greatest Severity Offense, Sex Offender, Threat to Government Officials, Deportable Alien, Sentence Length, Serious Escape, Prison Disturbance, Juvenile Violence, and Serious Telephone Abuse.

36. Custody Classification reviews are conducted annually by an inmate's case manager. Many of the same factors utilized to score the initial security classification are used when scoring an inmate's custody level. Additional criteria utilized in the Custody Classification are percentage of time served, drug/alcohol abuse history, type and frequency of misconduct reports, responsibility demonstrated during the period of incarceration, and family/community ties. The outcome of the Custody Classification is used to determine if an inmate warrants a transfer to a lesser or greater security prison, or whether the current institution is appropriate to address his security needs and concerns.

37. Mr. Eubank's sentence computation indicates he is serving a 384-month non-parolable, aggregated term of imprisonment for 2 counts of Brandishing a Firearm during a Crime

of Violence.  His release date is scheduled for January 16, 2037, via Good Conduct

Time release.

38. Initially, Mr. Eubanks was designated to FCI Victorville, California, a medium security

federal prison.  His drug and alcohol use at Victorville likely prompted his transfer to

the Special Management Unit (SMU) located at USP Lewisburg, Pennsylvania.  SMUs

are an extremely restrictive type of unit, which are designed to ensure the safety,

security, and orderly operation of other BOP facilities.  The SMU incorporates an

intense behavior modification program, with enhanced security measures, designed

toward changing the behaviors and mindset of inmates who present unique security and

management concerns.  There are four phases of the SMU program and during the

initial phases, inmates are stripped of most privileges, allowed only basic items, and

primarily restricted to their cells all day, every day.  The SMU is identified as a non-

punitive assignment; however, for those inmates, who spend up to two years in the

various phases of SMU, the program feels very punitive, isolative, and restrictive.

Unless a person has visited this Unit at the Lewisburg penitentiary, it is difficult to

comprehend how onerous the conditions, and how minimal the privileges that are

afforded to the SMU inmates.  I had the opportunity on several occasions, while

assigned to the BOP's Northeast Regional Office, to visit the SMU at Lewisburg.  I

distinctly recall, how the Warden at the time described the Unit.  Warden Donald

Romine told a group of us, "*The only things we allow inmates in the SMU to retain, are

their dreams.*"

39. SMU is one of the most physically and mentally demanding programs in the BOP.  So

intense is the program that the Office of Inspector General conducted a comprehensive

16

study on the effects of the detention and isolation aspects of the program. [4]  One of their

conclusions was that inmates are spending long periods of times, many with mental

illness, locked in isolation for extended periods of time:

> ... inmates, including those with mental illness, may spend years and even
>
> decades in RHUs. For example, we learned of an inmate with serious mental
>
> illness who spent about 19 years at the ADX before being transferred to a
>
> secure residential mental health treatment program. In addition, our sample
>
> of inmates with mental illness showed that they had been placed in the ADX
>
> for an average of about 69 months. Similarly, we found that between fiscal
>
> years (FY) 2008 and 2015, inmates with mental illness averaged about 896
>
> consecutive days, or about 29 months, in the SMU.

40. After approximately two years in the SMU, Mr. Eubanks was transferred to the general

population at USP Coleman, Florida.  He remained at the Coleman facility for a couple

years before being transferred to USP Lee, Virginia.  He remained at the Lee

penitentiary for less than a year, before being transferred to USP Canaan, Pennsylvania.

Mr. Eubanks arrived at the Canaan facility in early 2017, and within several months,

found himself being transferred again.  He arrived at USP Pollack, Louisiana, in

December 2017.  After approximately four months, he earned a transfer to the medium

security level facility at FCI Edgefield, South Carolina.  After a few months at

Edgefield, Mr. Eubanks was transferred to another medium level federal prison in

---

[4] Office of Inspector General, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness," Evaluation and Inspections Division 17-05, July 2017.

Bennettsville, South Carolina.  Mr. Eubanks remained at Bennettsville for a little more than two years, before his transfer back to a high security level penitentiary, at USP Big Sandy, Kentucky, in December 2020.  His final transfer occurred in 2021, to USP McCreary, Kentucky, where he is currently incarcerated.

41. The numerous transfers are indicative of the BOP's inability to assist Mr. Eubanks with the treatment he requires, and the BOP's response is to just continue to transfer the "problem inmate".  As a former warden, I tried very hard to not just take the stance of transferring the "problem", and I did my best to address the issues of the person to give every inmate a chance and an opportunity for positive change.  Unfortunately, with the passage of time, the BOP seems to have become less empathetic toward addressing the issues and assisting the individual inmate, with more emphasis being given to warehousing than treating.  Many programs have been created to satisfy the requirements of the First Step Act; however, those programs, which were recently implemented, do not address the needs presented by Mr. Eubanks.

42. As earlier stated, Mr. Eubank's current case manager has advised him that he will be considered for another transfer to a medium security level prison, once the COVID-19 pandemic protocols stabilize, providing he stays out of trouble until that time.  In my recent call with Mr. Eubanks, he expressed how important that transfer is to him, as life in a medium security level prison is markedly different, safer, for a former military police officer.  Mr. Eubanks would continue to be harassed and taunted at a medium security prison, but the likelihood and threat of physical danger would be somewhat lessened.

**CONCLUSION**

43. Mr. Eubanks has endured some extremely difficult challenges over the last 20 years.  If reviewing only his prison and criminal records, many would feel Mr. Eubanks is undeserving of a second chance or any type of early release from prison.  My perspective completely changed once I considered the contributions and sacrifices Mr. Eubanks made to our Country while serving in the United States Air Force.

44. First, I reviewed a recent report by the U.S. Sentencing Commission which conducted a study of veterans who are also incarcerated in federal prison. [5] One fact that caught my attention as it relates to Mr. Eubanks was:

> ... *among the reasons often cited for considering military service at sentencing are that veteran offenders often have high incidences of alcohol abuse, substance abuse, and mental health problems related to their military service.[23] Of the veteran offenders in this study, 13.1 percent indicated that they had abused alcohol at some time prior to their federal offense, while 66.7 percent indicated that they had used illegal substances. Half (51.1%) indicated that they had some history of mental health problems, a rate much higher than the rate for post- traumatic stress alone.*

45. During his time in the military, Mr. Eubanks was deployed overseas three separate times, two deployments were post-911.  With his third deployment in January 2004 to Iraq, he was assigned as a military police officer, in charge of guarding the main gate entrance to the military base.  This assignment was extremely dangerous and consistently a target of enemy forces.  During this tumultuous period, Mr. Eubanks

---

[5] United States Sentencing Commission, "*Federal Offenders Who Served in the Armed Forces,*" October 2021.

witnessed death and experienced unimaginable atrocities.  He was awarded various distinguished medals for his actions but his service to our Country, came with a high price.  Mr. Eubanks returned home in March 2004, a forever changed person.  I understand Mr. Eubanks began distancing himself from family and social settings and aligned only with other veterans who shared similar experiences.

46. His self-medication with marijuana and alcohol eventually led to his General Discharge under Honorable Conditions later in 2004.  The physical pain he was experiencing due to a back injury, resulted in his involvement with a Pain Management Clinic.  This encounter led to an eventual opioid prescription, by a doctor who provided minimal medical supervision.  Mr. Eubanks fell victim to opioids, resulting in his dependence on the drug.   This was the true beginning of his downward spiral, which eventually resulted in Mr. Eubank's poor decisions and criminal actions, leading him to where he is today.

47. Mr. Eubanks has an obvious drug dependency, which is not going to disappear without appropriate and adequate intervention and treatment.  To further compound the pressures in prison, the remaining inmate population are aware of his background as a former military police officer, which only serves to make his experience in prison more challenging, difficult, and distressing, since he is viewed by others as the "former cop".

48. As a prison consultant and expert, I very rarely advocate on behalf of an inmate, as I believe it is my duty to provide an unbiased report explaining the individual's adjustment during the incarceration period.  I rarely opine on what the outcome should be in these types of cases.   However, in Mr. Eubanks case, I believe I would be remiss

to not, at a minimum, state what I believe should occur, and what this war veteran

deserves from those of us who benefitted from his brave military service.

49. Mr. Eubanks is a 41-year-old war veteran who is serving a very lengthy sentence for

the criminal actions he committed more than 13 years ago.  It is unfortunate Mr.

Eubanks was not afforded treatment for his drug addiction before he embarked on a

criminal path to support his drug habit.  Now, he identifies as a convicted felon, with a

register number, being warehoused for many years in a correctional environment,

which is filled with dangerous and violent offenders.  I am not excusing Mr. Eubanks

criminal actions, yet I believe our Country has an obligation to our veterans, and in this

case, we have not fulfilled that obligation.  At a minimum, I believe Mr. Eubanks

should be afforded an opportunity to make amends for his wrongdoings and be granted

a chance to right his wrongs, while receiving the necessary treatment to address his

underlying conditions.  The federal prison system does not have the resources or

capability to achieve this.  I do not know what the exact and right answers are for Mr.

Eubanks, but I do know, that a continued course of action, like his experience for the

last 14 years, is strictly punitive and serves no rehabilitative measure for this decorated

Iraqi war veteran.

Executed on this 28th day of March 2022.


Maureen Baird (Mar 31, 2022 15:20 EDT)
Maureen P.  Baird

# Maureen Patricia Baird

Professional Profile

I currently work as a Corrections Consultant, specializing in the area of Federal Corrections. I have provided Expert Witness testimony in United States District Courts, at Sentencing Hearings for defendants who are facing a sentence of incarceration in the Federal System. I work as an independent Consultant and provide consulting services on all aspects of the Federal Prison System for private attorneys, Federal Defenders Offices and individuals and family members of those facing a possible federal prison sentence or those who have already been sentenced/incarcerated. I have prepared numerous Declarations for Attorneys within the U.S., and for Barristers/Solicitors in the United Kingdom, working on extradition cases. I have also provided Expert Testimony at Extradition Hearings in the Westminster Magistrates' Court in the UK regarding conditions of confinement in the Bureau of Prisons. My career in Adult Male/Female Corrections spanned 28 years with the Bureau of Prisons in various capacities, with my final positions as Warden and Senior Executive Service Warden at three Federal Prisons that encompassed a variety of missions and programs. I am an experienced Executive in Correctional Management with a demonstrated history of working in the law enforcement industry.

My experience in Federal Corrections began in 1989 as a case manager with the Department of Justice, Federal Bureau of Prisons. Throughout my 28 years with the Agency, I continued to acquire positions of increasing responsibility. In 2009, I was appointed to the position of Warden at the Federal Correctional Institution, Danbury, Connecticut, and was later promoted to Warden at the Metropolitan Correctional Center in New York City. There, I was appointed to Senior Executive Staff by the United States Attorney General and within two years, I was transferred to a position of greater responsibility as the Warden of the United States Penitentiary in Marion, Illinois. As warden, I was responsible for the leadership and direction of 300 to 350 staff members and approximately 1200 to 1500 inmates. During my tenure as warden for seven years, I was responsible for staff development and various specialized inmate housing units, including a high security management unit which mainly housed international terrorists who were assigned maximum custody. I led staff through a mission change at the Federal Prison in Danbury, where we had housed female offenders for several years and then transitioned to male offenders in 2013.  I was also a member of the Joint Terrorist Task Force, and a member of various other federal, state, and local groups.  I was very active with joint training that involved local, state, and federal law enforcement entities. For the last several years I have held Top Secret Clearance, only issued to a small percentage of Wardens and Executive Staff.

## Professional Experience

*Warden*                                                          *Dec 2015 - Oct 2016*

### *United States Penitentiary - Marion, IL*
- Was CEO of an institution which housed 1500 medium/high security male offenders
- Supervised 350 staff members and a 40-million-dollar budget
- Oversaw the institution and staffing, inmate programs, institution security, staff training, staff and inmate investigations and discipline, policy and procedural changes, community relations, regular training on emergency preparedness
- Provided training to all institution staff during an annual refresher training for six to eight weeks
- Provided training to new hires regarding procedures, rules, and regulations, ethics and code of conduct requirements and both basic and advanced correctional duties

*Warden*                                                          *Jun 2014 - Dec 2015*

### *Metropolitan Correctional Center - New York City, NY*
- Was CEO of a pre-trial federal prison which employed 350 staff and housed 700 all security level, pre-trial inmates and 150 low security sentenced offenders
- Performed all duties indicated above as warden at USP Marion, Illinois

**Warden**                                                        *Oct 2009 - Jun 2014*
Federal Correctional Institution - Danbury, CT
- Was CEO of an institution which employed 250 staff and housed 1200 female offenders
- Performed all duties indicated above as warden at USP Marion, Illinois, with an added emphasis on training geared toward female offenders

**Correctional Institution Administrator/Associate Warden**      *Aug 2007 - Oct 2009*
Metropolitan Detention Center - San Diego, CA
- Provided direction and leadership to 230 employees
- Assisted in the management of a 27 million dollar budget
- Oversaw high security/maximum custody pre-trial inmates and 200 low security sentenced inmates
- Ensured all mandatory internal and external security requirements were maintained and properly implemented
- Served on a forward-thinking workgroup focusing solely on future training trends
- Provided training on a regular basis to institution staff as well as other government agency staff
- Implemented several new proactive security measures which resulted in a more open form of communication between staff and inmates, thus allowing staff to find more contraband and providing a safer environment for staff and inmates
- Worked with union representatives to assist in resolving employee concerns as the Chairperson of the Labor Management Relations Board

**Regional Correctional Programs Administrator**                 *Feb 2005 - Aug 2007*

2

Bureau of Prisons, Western Regional Office - Dublin, CA
- Oversaw 22 federal prisons located in the Western Region of the United States
- Primarily focused on the development and training of correctional programs staff who were employed by the individual facilities
- Orchestrated on-site training at the institutions, ensured the staff were familiar with policy, provided guidance, and compiled a report following each training
- Assembled a training manual for all new case managers to assist them in their duties
- Conducted regional training with all case management coordinators from the 22 institutions on an annual basis
- Was appointed to various after-action committees to investigate serious incidents that occurred at the prisons within the region
- Acted in the position of Regional Director and Deputy Regional Director multiple times
- Participated in and coordinated several Institution Character Profiles to evaluate programs and review security procedures at various institutions Recommendations were made with regards to enhancing security or reorganizing programs.
- Was involved in the activation of all aspects of newly constructed federal prisons within the Western Region
- Coordinated a four-week online training session for case management coordinators to provide information/training on their new responsibilities through the merging of the Inmate Systems Department falling under their purview
- Received the Supervisor of the Year award from the Regional Director in June 2006

**Correctional Institution Administrator/Executive Assistant**       *Aug 2000 - Feb 2005*
Federal Correctional Institution - Schuylkill, PA
- Planned, supervised, and evaluated programs, training of new staff, and quarterly training of correctional officers
- Was the Chairperson for inmate's initial classifications and program reviews
- Conducted ongoing training and guidance for mentors and proteges as the Mentoring Coordinator

**Assistant Correctional Programs Administrator**       *Apr 1997 - Aug 2000*
Bureau of Prisons, Northeast Regional Office - Philadelphia, PA
- Committee Member
- Assisted in designing the current Security and Classification System utilized for classifying sentenced female offenders
   - Performed extensive research which suggested a need for a separate classification system for male and female offenders
   - The Bureau of Prisons compiled our findings and in a short time implemented the Committees' suggestions and created a separate Classification System for female offenders, which is still being utilized to date
- Coordinated and conducted annual training programs for all case management coordinators throughout the 23 institutions that comprised the Northeast Region
- Submitted recommendations for policy changes which were adopted and implemented
- Conducted on-site staff assistance visits at various institutions to provide training to staff

3

- Participated in after-action reviews following significant incidents at institutions within the region

**Case Management Coordinator**                              *Dec 1992 - Apr 1997*
Federal Correctional Complex **-** Allenwood, PA
- Served as Victim Witness Coordinator, Central Inmate Monitoring Coordinator, Inmate Performance Pay Coordinator and Public Information Spokesperson for the institution
- Oversaw security with regards to review and approval of inmates designated to the institution
- Wrote lesson plans and provided on-the-job training for new case managers and new counselors
- Provided ongoing training to all case managers, counselors, unit secretaries, and correctional officers regarding correctional programs, procedures, and responsibilities
- Was responsible for quality control of all case management paperwork prior to submission to the warden for signature

**Assistant Parole Liaison Administrator**            *Oct 1991-Dec 1992*
 Mid-Atlantic Regional Office – Annapolis Junction, MD
Duty Station – U.S. Parole Commission – Chevy Chase, MD
- Was responsible for Security Classifications and Designations of parole violators returning to federal prisons

**Case Manager**                                       *Mar 1989 – Oct 1991*
Federal Correctional Institution - Danbury, CT
Federal Prison Camp – Nellis Air Force Base - Las Vegas, NV
- Oversaw programs related to the 150-200 inmates assigned to my caseload
- Provided training to new case managers
- Conducted inmate classification and program reviews
- Assisted inmates with their release planning
- Provided guidance to inmates
- Conducted security and shakedowns within the institution
- Regularly filled in for correctional officer posts
- Wrote all reports pertaining to inmates on my caseload
- Regulated institution security and housing

**Education**

---

*Western Connecticut State University - Danbury, CT*

*Bachelor of Science in Justice and Law Administration, May 1988*
- Recipient of Justice and Law Administration Award of 1988

4

**Activities**

---

- Senior Executive Service Member
- Member of American Correctional Public Information Officer Association
- Member of Lion's Club
- Member of Association of Women Executives in Corrections
- Instructor/Trainer
- Volunteer for the American Cancer Society

5

**Expert Witness Testimony in the United States and the United Kingdom for the years 2018-2022:**

July 6, 2018: *United States v. Charles M. Hallinan*, United States District Court, Eastern District of Pennsylvania, Philadelphia, Pennsylvania.

July 1, 2019, and November 4, 2019: *United States of America v. Jabir Motiwala*, Westminster Magistrates' Court, London, United Kingdom.

June 23-25, 2020: *United States of America v. Arif Naqvi*, Westminster Magistrates' Court, London, United Kingdom.

September 29, 2020: *United States of America v. Julian Assange*, Westminster Magistrates' Court, London, United Kingdom.

October 27, 2020: *United States of America v. Christopher Taylor*, Westminster Magistrates' Court, London, United Kingdom.

May 26, 2021: *United States of America v. Olabanji Oladotun Egbinola*, Westminster Magistrates' Court, London, England, United Kingdom.

June 1, 2021: *United States of America v. Valerie Perfect Hayes, Jennifer Amnott, Gary Reburn*, Edinburgh Sheriff Court, Scotland, United Kingdom.

August 5, 2021: *Robert Wharton v. Jamie Sorber*, Eastern District of Pennsylvania, Philadelphia, Pennsylvania.

October 19, 2021: *United States v. Abdul Malik Abdul Kareem,* District of Arizona, Phoenix, Arizona.

October 25, 2021, *United States of America v. Anthony Baker*, Westminster Magistrates' Court, London, England, United Kingdom.

November 24, 2021, *United States of America v. Corey De Rose*, Westminster Magistrates' Court, London, England, United Kingdom.

January 27, 2022: *United States v. William Smith,* United States District Court, District of Columbia.

February 10, 2022, *United States of America v. Robert MacDonald and Christopher Hamilton,* Westminster Magistrates' Court, London, England, United Kingdom.

February 18, 2022, *United States v. Maurice Proctor*, United States District Court, District of Columbia.